## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDULAH HAKMAT, et al.,

                Petitioners,

      v.

GEORGE W. BUSH, et al.,

                Respondents.

Civil Action No. 06-1753 (EGS)

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONER'S
MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL
FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE NOTICE
OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTANAMO**

Respondents hereby oppose petitioner Abdulah Hakmat's motion for a preliminary

injunction requiring respondents to provide the Court and petitioner's counsel with 30 days'

advance notice before any transfer or removal of petitioner from the Guantanamo Bay Naval Base

in Cuba ("Guantanamo").  Pet'rs Mot. (dkt. no. 10).

Petitioner fails to discuss or even cite the D.C. Circuit's recent opinion in Boumediene v.

Bush, No. 05-5062, 2007 WL 506581, at *3-4 (D.C. Cir. Feb. 20, 2007), petition for cert. filed, 75

U.S.L.W. 3483 (U.S. March 5, 2007 (No. 06-1195), and petition for cert. filed, Al Odah v. United

States, 75 U.S.L.W. 3483 (U.S. March 5, 2007) (No. 06-1196), in which the Court of Appeals

held that the Military Commissions Act of 2006[1] ("MCA"), which became law on October 17,

2006, withdrew whatever district court jurisdiction there might have been over claims brought by

aliens captured abroad and detained as enemy combatants at Guantanamo, and rejected

constitutional challenges to the statute.  The MCA amends 28 U.S.C. § 2241 to provide that "[n]o

_____

[1] Pub. L. No. 109-366, 120 Stat. 2600.

court, justice, or judge shall have jurisdiction" to consider either (1) habeas petitions filed by aliens detained by the United States as enemy combatants, or (2) any other action "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" of such aliens, except for the exclusive review mechanism in the D.C. Circuit created under the Detainee Treatment Act of 2005[2] ("DTA") for addressing the validity of the detention of such aliens.  See MCA § 7.  This new amendment to § 2241 took effect on the date of enactment and applies specifically "to all cases, without exception, pending on or after the date of the enactment of this Act which relates to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001."  *Id.*

Independent of the MCA, the review mechanism created by the DTA also divests this Court of jurisdiction.  The DTA invests the D.C. Circuit with exclusive jurisdiction to address the validity of the United States' detention of aliens as enemy combatants, including at Guantanamo, and of final decisions of any military commissions.  See DTA § 1005(e)(2), (e)(3), as amended by the MCA.  Section 1005(e)(2) of the DTA states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.  Thus, even prior to enactment of the MCA, the DTA invested the Court of Appeals with the same "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," see DTA § 1005(e)(2), (e)(3), which, standing alone, deprives the district court of jurisdiction in cases where, as here, the petitioner challenges his detention as an enemy

---

[2] Pub. L. No. 109-148, Tit. X, 119 Stat. 2680.

combatant.  It is well-settled that an exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more general grants of jurisdiction including habeas corpus.  See, e.g., Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); FCC v. ITT World Commc'ns, Inc., 466 U.S. 463, 468 (1984) ("The appropriate procedure for obtaining judicial review of the agency's disposition of these issues was appeal to the Court of Appeals as provided by statute."); Laing v. Ashcroft, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial remedy is available"); Lopez v. Heinauer, 332 F.3d 507, 511 (8th Cir. 2003) ("Because judicial review was available . . . the district court was not authorized to hear this § 2241 habeas petition."); Telecomm. Research & Action Ctr. v. FCC, 750 F.2d 70, 77 (D.C. Cir. 1984) ("By lodging review of agency action in the Court of Appeals, Congress manifested an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power."); id. at 75, 78-79 (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals).

The relief requested by petitioner would, therefore, require an exercise of jurisdiction and authority in this case inconsistent with the DTA's investment of exclusive jurisdiction in the Court of Appeals and the MCA's withdrawal of other forms of jurisdiction, and respondents' jurisdictional argument is in no way immaterial or premature.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (" 'Without jurisdiction [a] court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function

remaining to the court is that of announcing the fact and dismissing the cause.' " (quoting Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868)).

Accordingly, the Court should deny petitioner's request for relief for lack of jurisdiction. If this Court were to exercise jurisdiction in contravention of Boumediene, the MCA, and the DTA, at a minimum, the Court should stay the proceedings, including with respect to petitioner's requested relief, pending resolution of the petitions for certiorari in Boumediene and, if either petition is granted, a decision by the Supreme Court on the merits.

Respondents also oppose petitioner's request for relief for the reasons discussed below.

## BACKGROUND

### A.     Detention of Enemy Combatants at Guantanamo

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported it.  In the course of those hostilities, the United States has captured or taken custody of a number of foreign nationals as enemy combatants, some of whom are being held at Guantanamo.

### B.     Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo

Although the laws of war permit the United States to hold enemy combatants in detention for the duration of hostilities, the United States has no interest in detaining any individuals longer than necessary.  See Decl. of then Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3, attached hereto as Exhibit 1;

Decl. of then Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2,

attached hereto as Exhibit 2.[3]  The Department of Defense ("DoD") conducts at least an annual

review of each Guantanamo detainee to determine whether continued detention is warranted

based on factors such as whether the detainee continues to pose a threat to the United States and

its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  The annual reviews include those currently

being conducted through Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[4]  As part of

the Administrative Review Board process, counsel who represent detainees have been invited to

make written submissions concerning whether further detention is appropriate; in these

submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or

repatriation.

Following consultation with various agencies, a senior DoD official grants the ultimate

approval for the transfer of any Guantanamo detainee to the control of another government.

---

[3] The June 2, 2005 Waxman Declaration replaces and supersedes two prior declarations
by former Deputy Assistant Secretary Waxman submitted in connection with similar motions in
other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The March 8, 2005 Prosper
Declaration was originally submitted in connection with a similar motion in Abdah v. Bush, Civ.
A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005).  While Mr. Waxman and Mr.
Prosper have both left office, the policies and practices set forth in their prior declarations remain
in effect and are applicable to the instant case.  Certain numerical information in the declarations
is subject to updating.  See infra note 5.

[4] See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004,
re: Admin. Review Procedures for Enemy Combatants in the Control of the DoD at Guantanamo
Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518
gtmoreview.pdf>>; Memorandum dated Sept. 14, 2004, re: Implementation of Admin. Review
Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba,
available at <<http://www.defenselink.mil/news/Sep2004/d20040914adminreview.pdf>>;
Memorandum dated July 14, 2006, re: Revised Implementation of Admin. Review Procedures
for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba,
<<http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf>>.

Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  As of the time of Mr. Waxman's Declaration, 234 Guantanamo detainees had been so transferred, over a period spanning several years, including 167 transferred for release.  Waxman Decl. ¶ 4; see also Prosper Decl. ¶ 2.[5]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government.  Waxman Decl. ¶ 5.  The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to

---

[5]  The numbers of detainees transferred from Guantanamo in respondents' declarations were accurate as of the dates of the declarations.  As of the date of this brief, approximately 360 detainees had been transferred by DoD from Guantanamo.  See, e.g., DoD News Releases available at <<http://www.defenselink.mil/news/nrdgb.html>>.

the United States and its allies.  <u>Id.</u>  In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States.  <u>Id.</u>  Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States.  <u>Id.</u>  In fact, most of the Guantanamo detainees who have been transferred by DoD to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer.  <u>Id.</u>

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once DoD approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.  <u>Id.</u>  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant.  Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the Department of State are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the Department of State's annual Country Reports on Human Rights Practices) and the relevant Department of State regional bureau, country desk, or U.S. Embassy.  Prosper Decl. ¶ 7.  When evaluating the adequacy of assurances, Department of State officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States.  Prosper Decl. ¶ 8.  In an appropriate case, the Department of State may consider various monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where DoD decided not to transfer

detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7;

Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government

depends on its ability to treat its dealings with the foreign government with discretion.  Prosper

Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of

State's communications with foreign governments concerning allegations relating to torture.

Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained,

because such disclosure would have a chilling effect on and cause damage to our ability to

conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to

disclose its communications with a foreign government relating to particular mistreatment or

torture concerns outside appropriate Executive Branch channels, that government and potentially

other governments would likely be reluctant to communicate frankly with the United States

concerning such issues in the future.[6]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result,

disclosure could impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts related to the war

on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

---

[6] Another reason such disclosure would be harmful is that the Department of State's
recommendation concerning transfer relies heavily on facts and analyses provided by Embassies
and other Department of State offices, and confidentiality is necessary to ensure that the advice
and analysis provided by those offices are useful and informative for the decision-maker.
Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information
and interfere with the ability of our foreign relations personnel to interact effectively with
foreign state officials.  Id.

## ARGUMENT

### I.     PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for a preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.' " See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).

II.     **PETITIONER FAILS TO SHOW IRREPARABLE INJURY**

      A.     **The Mooting of a Habeas Claim that Naturally Flows From
Relinquishment of United States Custody Does Not Constitute
Irreparable Injury Justifying a Preliminary Injunction**

Petitioner argues that advance notice is necessary in order to "protect" the Court's
jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas
claims and curtail the Court's review of the legality of his detention.  <u>See</u> Pet'rs Mot. at 4-6.  As
the D.C. Circuit made clear in <u>Boumediene</u>, 2007 WL 506581, at *3-9, however, the Court does
not have any jurisdiction over this case to protect.

Moreover, petitioner's argument rests on faulty logic.  <u>See</u> <u>Qassim v. Bush</u>, 466 F.3d 1073
(D.C. Cir. 2006) (per curiam) (granting appellees' emergency motion to dismiss because
petitioners' habeas petition was rendered moot when petitioners were voluntarily released from
Guantanamo to Albania).  The ultimate relief sought by petitioner in this habeas case is obviously
release from custody.  Any right to challenge the legality of one's detention through a habeas
proceeding cannot reasonably extend so far as to require that detention be continued, after the
Executive determines that the military rationales for enemy combatant detention no longer
warrant such custody, for no reason other than to be able to test the legitimacy of detention the
Executive no longer is interested in maintaining.[7]  "The ultimate objective of a habeas petition is

---

[7] Transfers of Guantanamo detainees are not undertaken in order to thwart any
jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since
October 2002, long before the Supreme Court's decision in <u>Rasul v. Bush</u>, 524 U.S. 466 (2004),
and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶
4.  It has been noted that 131 transfers had occurred three months or longer before <u>Rasul</u>
was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of
transfer in order to thwart the jurisdiction of the courts."  <u>Al-Anazi</u>, 370 F. Supp. 2d at 196 n.7
(citing DoD, <u>Transfer of Afghani and Pakistani Detainees Complete</u> (Mar. 15, 2004)); <u>see also</u>
(continued...)

release from custody." Almurbati v. Bush, 366 F. Supp. 2d 72, 78 (D.D.C. 2005). As one Judge of this Court stated, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction." Id. at 80; see also Al-Anazi v. Bush, 370 F. Supp. 2d 188, 198 (D.D.C. 2005) ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners.") (citation omitted).

That release from United States custody will give petitioner all the relief he can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, former detainees may be taken into custody and detained in the receiving country based on that country's independent interests and determinations. As respondents' declarations make clear, when DoD transfers detainees to the control of other governments, the detainees are no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's independent decision, based on its domestic laws, that the individual should be detained. Waxman Decl. ¶ 5. Indeed, even if the United States transfers a detainee to his home government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws. The Court should therefore reject petitioner's suggestion that the

---

[7](...continued)
supra note 4 (citing documents showing that administrative review process for considering transfers and repatriations predates the filing of this and most other detainee habeas petitions).

possibility of future detention in an individual's home or another country based on that country's independent interests and determinations constitutes irreparable injury warranting an injunction.[8]

**B.    Speculation that the United States Will Defy its Own Policy by Transferring Detainees to Countries in Circumstances Where it is Believed They Will be Tortured Does Not Warrant a Preliminary Injunction**

Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by rife speculation that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send him to a foreign country under circumstances where he will be tortured. Petitioner asserts that he has reason to fear that he will be transferred to a country where he will be tortured based on "information and belief" and unsubstantiated allegations contained in media reports that are several years old; in fact, petitioner characterizes the media report on which he principally relies as a "recent news account," even though the report is over two years old. Pet'rs Mot. at 2-4. Plaintiff's assertion, however, is directly contradicted by the attached Waxman and Prosper Declarations, which provide detailed descriptions of the United States' policies and processes for transferring Guantanamo detainees. The declarations conclusively and unmistakably demonstrate that it is the

---

[8] The Court of Appeals in Omar v. Harvey, No. 06-5126, 2007 WL 420137, at *3-9 (D.C. Cir. Feb. 9, 2007), concluded that the district court had jurisdiction to issue the challenged injunction, whereas it is clear from Boumediene, the MCA, and the DTA, that the district court does not have jurisdiction to issue petitioner's requested injunction in this case. Moreover, Omar involved a habeas petition by an American citizen held by a multi-national force for prosecution in the Central Criminal Court of Iraq, Omar, 2007 WL 420137, at *1-3, a much different situation than that presented here.

policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  This policy is implemented through a process that contains several levels of precautions and safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to assume that the United States' policy and practice is somehow a sham or pretext.  There is no valid basis for such an assumption.

Rather, as one Judge has found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit."  Almurbati, 366 F. Supp. 2d at 78.  Moreover, another Judge found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo."  Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196.  Thus, petitioner has failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about possible torture in a foreign country constitutes irreparable harm that must be remedied by a preliminary injunction.

III.    **PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS
        IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
        OR RELEASE IN ACCORDANCE WITH THE POLICIES
        EXPRESSED IN RESPONDENTS' DECLARATIONS**

Petitioner fares no better on the second prong of the preliminary injunction analysis, which requires him to show that he is likely to succeed in preventing a transfer from Guantanamo.

To be clear, aside from the withdrawal of district court jurisdiction in this case under the MCA, as confirmed by <u>Boumediene</u>, and the DTA, whatever the merits of petitioner's substantive claims that he is wrongfully detained, <u>see</u> Pet'rs Mot. at 5, it is not the likelihood of success on <u>those</u> claims that matters for purposes of the instant motion for preliminary injunction. Rather, as two Judges of this Court (who reached opposite outcomes on the bottom line of whether to require advance notice) have agreed, the likelihood of success analysis must focus on the legal basis for petitioner to obtain an order preventing <u>termination</u> of detention by the United States in the manner described in the declarations submitted herewith. See <u>Al-Anazi</u>, 370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's <u>detention</u> does not at all imply that there exists a sound basis to challenge the legality of one's <u>transfer</u>. Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not to their <u>detention</u> at Guantanamo.") (emphasis in original); <u>Abdah v. Bush</u>, 2005 WL 711814, at *4 (D.D.C. March 29, 2005) ("<u>if</u> there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted") (emphasis in original). Petitioner recognizes as much, stating that the purpose of the advance notice is to "to enable [his] counsel to contest any [] removal from Guantanamo and preserve the jurisdiction of the Court in this matter." Pet'rs Mot. at 1.

Nevertheless, petitioner fails to identify any valid source of legal authority for an order preventing termination of detention. And even if a valid source of legal authority existed for an order prohibiting a transfer, the Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a foreign nation's justice system and the procedures or treatment that an individual may

experience in a foreign nation, weighs heavily against petitioner's likelihood of success in

contesting a transfer or repatriation.

A.   **No Valid Legal Basis Exists for a Judicial Order
      Enjoining Transfer or Repatriation of an Individual
      Previously Detained by the United States as an Enemy Combatant**

1.   **Protection of the Court's Jurisdiction**

The D.C. Circuit held in <u>Boumediene</u>, 2007 WL 506581, at *3-9, that the MCA withdraws

district court jurisdiction over habeas petitions brought by aliens captured abroad and detained as

enemy combatants at Guantanamo, and rejected constitutional challenges to the statute.  Thus,

protection of the Court's jurisdiction is not a valid legal basis for an order enjoining transfer or

repatriation of petitioner because the Court does not have any jurisdiction over this case to

protect.

Moreover, as discussed above in the context of irreparable harm, <u>see</u> <u>supra</u> Section II. A,

protection of the Court's jurisdiction would not be an appropriate legal rationale for an order

forbidding transfer or repatriation of an individual detained at Guantanamo, because

relinquishment from United States custody (which occurs in every such transfer or repatriation)

represents the full extent of relief that petitioners could obtain from a habeas petition.  <u>See</u>

<u>Almurbati</u>, 366 F. Supp. 2d at 80 ("[O]nce the respondents release the petitioners from United

States custody . . . they will have obtained the result requested and at that point there will be no

further need for this Court to maintain jurisdiction."); <u>see also</u> <u>Qassim</u>, 466 F.3d at 1076-78

(release from custody rendered petitioners' habeas petitions moot); <u>Al-Anazi</u>, 370 F. Supp. 2d at

198.[9]  Indeed, it has been noted that, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now – with the respondents taking steps to transfer those individuals out of United States control, and the petitioners compelled to come forward with some legal or evidentiary basis to prevent transfer to an 'undesirable' country."  Al-Anazi, 370 F. Supp. 2d at 196.  Thus, petitioner does not enjoy a likelihood of success in obtaining an order barring a transfer in order to "protect" the Court's jurisdiction.

## 2.     International Treaties

Petitioner also cannot argue that a transfer or repatriation would violate certain international treaties such as the Geneva Conventions.  These claims are not valid, have not been recognized even by the courts that have ordered advance notice, and do not provide a basis for finding a likelihood of success in obtaining an order barring a transfer or repatriation.  The D.C. Circuit has held that "the 1949 Geneva Convention does not confer upon [a detainee] a right to enforce its provisions in court."  Hamdan v. Rumsfeld, 415 F.3d 33, 40 (D.C. Cir. 2005), rev'd on

---

[9] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody."  Al-Marri v. Bush, Civ. A. No. 04-2035, 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioners may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

other grounds Hamdan, 548 U.S. –, 126 S. Ct. at 2794.[10]  In any event, neither this petitioner nor

any others have identified any provision in any treaty that is in conflict with the United States'

policy governing transfers and repatriations of individuals detained at Guantanamo by DoD, or

that would be violated by a transfer or repatriation undertaken in accordance with that policy.[11]

### B.    Principles Underlying the Rule of Non-Inquiry Militate Heavily Against Petitioner's Likelihood of Success

Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an advance

notice requirement to support and facilitate such involvement, the separation of powers would bar

such relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of

the Executive Branch."  People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 23 (D.C.

---

[10] The Supreme Court's holding in Hamdan is not to the contrary.  In Hamdan, the Court concluded that the petitioner in that case could invoke Article 3 of the 1949 Geneva Convention, not because the Convention's provisions provided petitioner with enforceable rights, but because Article 3 was incorporated into a provision of the Uniform Code of Military Justice governing military commissions.  See Hamdan, 548 U.S. –, 126 S. Ct. at 2794 (assuming that the 1949 Conventions "would, absent some other provision of law, preclude [petitioner's] invocation of the Convention's provisions as an independent source of law binding the Government's actions and furnishing petitioner with any enforceable right").

[11] Several other petitioners have also pointed to the International Covenant on Civil and Political Rights ("ICCPR") and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT") as legal bases for an order requiring advance notice of a transfer.  However, no Judge has adopted those arguments, and, indeed, numerous courts have held, just as the D.C. Circuit has held with respect to the Geneva Conventions, that those treaties do not give rise to judicially enforceable rights.  See, e.g., Sosa v. Alvarez-Machain, 542 U.S. 692, 734-35 (2004) (ICCPR); In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 480 (D.D.C. 2005) (ICCPR); Khalid v. Bush, 355 F. Supp. 2d 311, 327 (D.D.C. 2005) (ICCPR and CAT); see also Al-Anazi, 370 F. Supp. 2d at 194 (rejecting petitioners' argument that Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts, could serve as legal basis for prohibiting or limiting transfer of wartime detainees to other countries); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas petition).

Cir. 1999) (citing <u>Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.</u>, 333 U.S. 103

(1948)); <u>see also</u> <u>Holmes v. Laird</u>, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as

this, 'the controlling considerations are the interacting interests of the United States and of foreign

countries, and in assessing them [the courts] must move with the circumspection appropriate

when [a court] is adjudicating issues inevitably entangled in the conduct of our international

relations.' ") (quoting <u>Romero v. Int'l Terminal Operating Co.</u>, 358 U.S. 354, 383 (1959)).[12]  If

the Court were to entertain petitioner's claim to a right to contest repatriation or removal from

Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review

of a transfer or repatriation decision could involve scrutiny of United States officials' judgments

and assessments on the likelihood of torture in a foreign country, including judgments on the

reliability of information and representations or the adequacy of assurances provided, and

confidential communications with the foreign government and/or sources therein.  Prosper Decl.

¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important sources of

information and interfere with our ability to interact effectively with foreign governments.

Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government in question, as

well as other governments, would likely be reluctant to communicate frankly with the United

States in the future concerning torture and mistreatment concerns.  Prosper Decl. ¶¶ 10, 12.  This

---

[12] In <u>Holmes</u>, U.S. citizen service members sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. <u>citizens</u>, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

chilling effect would jeopardize the cooperation of other nations in the war on terrorism.  Prosper

Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the

analogous context of extradition, courts have uniformly eschewed inquiry into " 'the fairness of a

requesting nation's justice system' " and " 'the procedures or treatment which await a surrendered

fugitive in the requesting country.' "  United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.

1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983));

see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "[c]ounsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for

an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

laws and the manner in which they are enforced."  Id. at 1067.  "It is the function of the Secretary

of State to determine whether extradition should be denied on humanitarian grounds."  Id.

Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch") (internal quotation marks

20

omitted); <u>Peroff v. Hylton</u>, 563 F.2d 1099, 1102 (4th Cir. 1977); <u>In re Sandhu</u>, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); <u>Hoxha v. Levi</u>, 465 F.3d 554, 564-65 (3d Cir. 2006) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry).  <u>See generally</u> Jacques Semmelman, <u>Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings</u>, 76 Cornell L. Rev. 1198 (1991).

  The force of these principles is not diminished by the fact that petitioner seeks judicial review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely trying to block an extradition.  The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[13]  <u>See</u> <u>In re Smyth</u>, 61 F.3d 711, 714 (9th Cir. 1995) ("Undergirding this principle is the

_____

[13] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing <u>In re Howard</u>, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from <u>Howard</u> was characterized as <u>dicta</u> by the First Circuit in a subsequent decision.  <u>See</u> <u>Kin-Hong</u>, 110 F.3d at 111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance.  <u>See</u> <u>id.</u> at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).  Moreover, to the extent that petitioner may contend that the only possible way to repatriate him would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit.  <u>See</u> <u>United States v. Alvarez-Machain</u>, 504 U.S. 655 (1992); <u>Ker v. Illinois</u>, 119 U.S. 436 (1886); <u>Coumou v. United States</u>, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, Civ. A. No. 93-1465, 1995 WL 2292, at *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioner cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country, as well as the credibility and adequacy of a foreign government's assurances. Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters " 'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry' ") (quoting Chicago & S. Air Lines, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring that petitioner's counsel and this Court be given advance notice of any upcoming transfer or release. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court. And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of

22

repatriation for that of the appropriate Executive Branch officials.

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE
##         WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seeks advance notice is to enable them to

seek an order blocking a transfer or repatriation decision that the Executive would already have

made after consultation and coordination with the foreign government in question.  Such an

advance notice requirement foreshadows judicial review and intervention that would be

accompanied by the attendant harms discussed in the declarations of then Deputy Assistant

Secretary Waxman and then Ambassador Prosper submitted herewith.  See Waxman Decl. ¶ 8;

Prosper Decl. ¶¶ 10, 12.  Even if such judicial review did not ultimately result in an injunction

against transfer, the mere inquiry into the United States' dialogue with foreign nations and into

the terms of a transfer and any assurances that may have been obtained would cause grave harm.

See supra Section III.B (describing interests that underlie the Rule of Non-Inquiry); Waxman

Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as exemplified

by an advance notice requirement, causes separation-of-powers harm by undermining the ability

of the Executive Branch to speak with one voice in its dealings with foreign nations.  See Crosby

v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that

"compromise the very capacity of the President to speak for the nation with one voice in dealing

with other governments").  An advance notice requirement, after all, would make the results of

diplomatic dialogue between the Executive Branch and a foreign government regarding

repatriations or transfers inherently contingent because the effective acquiescence of another

Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such

a requirement would also inject delays into future transfers.  These harms weigh heavily against

entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested

with the authority both to conduct military functions, such as detention of enemy combatants for

the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within

its constitutional sphere of responsibility.[14]  As one Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

---

[14] While two Judges, in granting preliminary injunctions, have relied on the general
statement that "[i]t is always in the public interest to prevent the violation of a party's
constitutional rights," G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079
(6th Cir. 1994), cited in Al-Joudi v. Bush, Civ. A. No. 05-0301 (GK), 2005 WL 774847, at *6
(D.D.C. Apr. 4, 2005); Abdah, 2005 WL 711814, at *6, that formulation leaves the question
what violations of constitutional rights (assuming arguendo that enemy aliens detained at
Guantanamo possess rights under the United States Constitution, but see Boumediene, 2007 WL
506581, at *4-9 (holding that aliens captured abroad and detained as enemy combatants at
Guantanamo do not have constitutional rights)), are present or imminent here and stand to be
prevented by an injunction.  As discussed above, respondents' policy and practices governing
transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioners
may have, constitutional or otherwise.  The public interest surely does not support assuming
without any foundation that Executive Branch officials are wont to engage in constitutional
violations unless supervised by the courts.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion be denied.

Dated:  March 16, 2007                Respectfully submitted,

                                                    PETER D. KEISLER
                                                    Assistant Attorney General

                                                    DOUGLAS N. LETTER
                                                    Terrorism Litigation Counsel

                                                      _/s/_ Nicholas A. Oldham_____
                                                    JOSEPH H. HUNT (D.C. Bar No. 431134)
                                                    VINCENT M. GARVEY (D.C. Bar No. 127191)
                                                    JUDRY L. SUBAR (D.C. Bar No. 347518)
                                                    TERRY M. HENRY
                                                    JAMES J. SCHWARTZ
                                                    ROBERT J. KATERBERG
                                                    NICHOLAS J. PATTERSON
                                                    ANDREW I. WARDEN
                                                    EDWARD H. WHITE
                                                    NICHOLAS A. OLDHAM
                                                    Attorneys
                                                    United States Department of Justice
                                                    Civil Division, Federal Programs Branch
                                                    20 Massachusetts Ave., N.W.
                                                    Washington, DC  20530
                                                    Tel:  (202) 514-2000
                                                    Fax:  (202) 616-8470

                                                    Attorneys for Respondents

## DECLARATION OF MATTHEW C. WAXMAN

I, Matthew C. Waxman, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Deputy Assistant Secretary of Defense for Detainee Affairs in the Department of Defense ("DoD"). My office is organized under the office of the Under Secretary of Defense for Policy. The office of Detainee Affairs, which I supervise, is responsible for providing policy advice to the Under Secretary of Defense on matters regarding detainees in DoD control. I have served in this position since August of 2004. The following statements provide a general overview of the process of transferring a detainee in DoD control at the United States Naval Base at Guantanamo Bay, Cuba ("GTMO") to the control of a foreign government. These statements are not intended to be an exhaustive description of all of the steps that might be undertaken in particular cases but do reflect United States policy and practices with respect to transfers of detainees from GTMO. I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties. This declaration replaces my prior two declarations (dated March 8, 2005 and March 16, 2005) submitted in connection with various habeas petitions pending in this Court.

2. One of DoD's current missions is to use all necessary and appropriate force to defeat the al Qaeda terrorist network and its supporters. In the course of that campaign – which remains ongoing – the United States and its allies have captured thousands of individuals overseas, virtually all of whom are foreign nationals. Through a screening and evaluation process, DoD determines whether the individuals should be detained during the conflict as enemy combatants. Approximately 520 of the foreign nationals are being held by DoD at GTMO.

3. It is appropriate for DoD to detain these enemy combatants as long as hostilities are ongoing. Nonetheless, DoD has no interest in detaining enemy combatants longer than

necessary. Accordingly, DoD is conducting at least annual reviews of each GTMO detainee to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies. Where continued detention is deemed no longer necessary, a detainee may be transferred to the control of another government for release. Furthermore, the United States also transfers GTMO detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the United States and its allies. Such governments can include the government of a detainee's home country, or a country other than the detainee's home country that may have a law enforcement, prosecution, or other interest in the detainee. Transfers of detainees are and have been made in accordance with the policy and process outlined herein, rather than to thwart the actual or putative jurisdiction of any court.

4. As of today, 234 detainees have been transferred by the DoD from GTMO, with 167 transferred for release, and 67 transferred to the control of their home governments for further detention, investigation and/or prosecution, as appropriate. Of those 67 detainees who have been transferred to the control of other governments for further detention, investigation and/or prosecution, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco, 6 to France, 4 to Saudi Arabia, 2 to Belgium, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia. These 234 transfers have occurred over a time span beginning in October 2002.

5. When the DoD transfers GTMO detainees to the control of other governments for continued detention, investigation, and/or prosecution, the DoD does so after dialogue with the

-2-

receiving government. Such dialogue may be initiated by the receiving government or may be initiated by the United States. In either situation, the purpose of the dialogue is to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws and independent determinations that will ensure that the detainee will not pose a continuing threat to the United States and its allies.   In all such cases of transfer for continued detention, investigation, and/or prosecution, as appropriate, as well as situations in which the detainee is transferred for release, the detainee is transferred entirely to the custody and control of the other government, and once transferred, is no longer in the custody and control of the United States; the individual is detained, if at all, by the foreign government pursuant to its own laws and not on behalf of the United States. When detainees are transferred to the custody or control of their home governments, it is frequently the case that the home government takes the detainee into its custody, at least for an initial period. In some cases, the home government has subsequently released the detainee, sometimes after a period of questioning or investigation, while in other cases, the detainees have remained in confinement or subject to other restrictions in their home countries for various reasons based on the determinations and laws of the home government. Of the 67 GTMO detainees transferred by the DoD to the control of their home countries, most have subsequently been released from detention.

6. Once a DoD transfer of a GTMO detainee is proposed, including for possible detention, investigation and/or prosecution, the views of interested United States Government agencies are considered.   For such a transfer, it is the policy of the United States, consistent with Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, not to repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured.   Therefore, if a transfer is deemed

- 3 -

appropriate, a process is undertaken, typically involving the Department of State, in which

appropriate assurances regarding the detainee's treatment are sought from the country to whom

the transfer of the detainee is proposed.    The accompanying Declaration of Pierre-Richard

Prosper accurately and completely describes that process to the best of my information and

belief.

7. The ultimate decision to transfer a detainee to the control of another government is

made with the involvement of senior United States Government officials. The Secretary of

Defense or his designee ultimately approves a transfer deemed to be appropriate. (In June 2004,

the Secretary of the Navy was appointed the designated civilian official to operate the annual

review process that assesses whether each detainee held by the DoD at GTMO should be

released, transferred, or continued in detention at GTMO. The Secretary of the Navy will make

the final decision in this process after considering the recommendation of the review board and

input from other United States Government agencies.) Decisions on transfer are made on a case-

by-case basis, taking into account the particular circumstances of the transfer, the country, and

the detainee concerned, as well as any assurances received from the receiving government. If a

case were to arise in which the assurances obtained from the receiving government are not

sufficient when balanced against treatment concerns, the United States would not transfer a

detainee to the control of that government unless the concerns were satisfactorily resolved.

Circumstances have arisen in the past where the Department of Defense elected not to transfer

detainees to their country of origin because of torture concerns.

8.    As noted in the Declaration of Pierre-Richard Prosper, transfers of detainees are

extremely sensitive matters that involve diplomatic relations with other countries, as well as the

law enforcement and intelligence interests of other countries.  Requiring the United States to

unilaterally disclose information about proposed transfers and negotiations outside of appropriate

executive branch agencies could adversely affect the relationship of the United States with other

countries and impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts, including with

respect to our joint efforts in the war on terrorism. Judicial review, including the possible

overturning of decisions to transfer and even delays in transfers occasioned by review and

possible appeals, could lead to similar harm and could negatively affect our ability to succeed in

the war on terrorism.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2005.

Matthew C. Waxman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MAHMOAD ABDAH, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1254 (HHK) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, | ) | |
| *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

DECLARATION OF PIERRE-RICHARD PROSPER

1

I, Pierre-Richard Prosper, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Ambassador-at-Large for War Crimes Issues and have supervised the operation of the Department of State Office of War Crimes Issues (S/WCI) since July 13, 2001. In that capacity I advise the Secretary of State directly and formulate U.S. policy responses to serious violations of international humanitarian law committed in areas of conflict throughout the world. As the President's envoy, I travel worldwide and engage foreign government leaders and international organizations to build bilateral and international support for U.S. policies related to armed conflicts and international humanitarian law. Since September 11, 2001, my office has played a key role in maintaining a diplomatic dialogue with foreign governments whose nationals have been captured in connection with the armed conflict with the Taliban and al Qaida and who are detained at the U.S. Naval Base at Guantanamo Bay, Cuba. The following statements provide a general overview of the Department of State role in carrying out United States policy with respect to the transfer to foreign governments of detainees held by the Department of Defense at Guantanamo Bay and the process that is followed to ensure that any international obligations and United States policies are properly implemented. They are not intended to be an exhaustive description of all of the steps that might be undertaken in any particular case, but do reflect United States policy and practices with respect to transfers from Guantanamo. I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The United States has no interest in detaining enemy combatants longer than necessary. The paramount goal is to ensure, to the maximum extent reasonably possible, that transferring a detainee out of U.S. Government control prior to the cessation of hostilities will

2

not increase the risk of further attacks on the United States or its allies. The Secretary of

Defense, or his designee, is generally responsible for approving the transfer of detainees from

Department of Defense control at Guantanamo Bay to other governments either for release or for

further detention, investigation, prosecution or control, as appropriate. On an ongoing basis, the

Department of Defense reviews the continued detention of each individual it holds at

Guantanamo Bay Naval Base, Cuba. As a result of this review process, two hundred and eleven

(211) detainees have departed Guantanamo, with 146 transferred for release, and 65 transferred

to the control of host governments for further detention, investigation and prosecution, as

appropriate. Of those 65 detainees who have been transferred to the control of host

governments, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to

Morocco, 6 to France, 4 to Saudi Arabia, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait,

and 1 to Australia.

  3. The Department of Defense consults with appropriate United States Government

agencies, including the Department of State, before determining whether to transfer particular

individuals. Detainees have been transferred for release when it is determined that they no

longer meet the criteria of enemy combatants or no longer pose a continuing threat to the U.S.

security interests. Detainees have been transferred to the control of their governments of

nationality when those governments are prepared to take the steps necessary to ensure that the

detainees will not pose a continuing threat to the United States. A detainee may be considered

for transfer to a country other than his country of nationality, such as in circumstances where that

country requests transfer of the detainee for purposes of criminal prosecution.

  4. Of particular concern to the Department of State in making recommendations on

3

transfers is the question of whether the foreign government concerned will treat the detainee humanely, in a manner consistent with its international obligations, and will not persecute the individual on the basis of his race, religion, nationality, membership in a social group, or political opinion. The Department is particularly mindful of the longstanding policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured or, in appropriate cases, that the person has a well-founded fear of persecution and would not be disqualified from persecution protection on criminal- or security-related grounds. This policy is consistent with the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention") and the Convention Relating to the Status of Refugees ("Refugee Convention"). The Department of State works closely with the Department of Defense and relevant agencies to advise on the likelihood of persecution or torture in a given country and the adequacy and credibility of assurances obtained from a particular foreign government prior to any transfer.

5. The Department of State generally has responsibility to communicate on these matters as between the U.S. and foreign governments. The Department of State receives requests from foreign governments for the transfer of detainees and forwards such requests to the Department of Defense for coordination with appropriate Departments and agencies of the United States Government. The Department of State also communicates requests from the United States to foreign governments to accept the transfer of their nationals.

6. Once the Department of Defense has approved a transfer from Guantanamo Bay and requests the assistance of the Department of State, my office would initiate transfer discussions with the foreign government concerned. The primary purpose of these discussions is to learn

4

what measures the receiving government is likely to take to ensure that the detainee will not pose

a continuing threat to the United States or its allies and to obtain appropriate transfer assurances.

My office seeks assurances that the United States Government considers necessary and

appropriate for the country in question. Among the assurances sought in every transfer case in

which continued detention by the government concerned is foreseen is the assurance of humane

treatment and treatment in accordance with the international obligations of the foreign

government accepting transfer. The Department of State considers whether the State in question

is party to the relevant treaties, such as the Torture Convention, and pursues more specific

assurances if the State concerned is not a party or other circumstances warrant.

      7. Decisions with respect to Guantanamo detainees are made on a case-by-case basis,

taking into account the particular circumstances of the transfer, the country, the individual

concerned, and any concerns regarding torture or persecution that may arise.

Recommendations by the Department of State are decided at senior levels through a process

involving Department officials most familiar with international legal standards and obligations

and the conditions in the countries concerned. Within the Department of State, my office,

together with the Office of the Legal Adviser, the Bureau of Democracy, Human Rights, and

Labor, and the relevant regional bureau, normally evaluate foreign government assurances and

any need for protection, and, if deemed appropriate, brief the Secretary or other Department

Principals before finalizing the position of the Department of State. The views of the Bureau of

Democracy, Human Rights, and Labor, which drafts the U.S. Government's annual Human

5

Rights Reports,[1] and of the relevant regional bureau, country desk, or U.S. Embassy are important in evaluating foreign government assurances and any individual persecution or torture claims, because they are knowledgeable about matters such as human rights, prison conditions, and prisoners' access to counsel, in general and as they may apply to a particular case in the foreign country concerned, as well as particular information about the entity or individual that that is offering the assurance in any particular case.

8. The essential question in evaluating foreign government assurances is whether the competent Department of State officials believe it is more likely than not that the individual will be tortured in the country to which he is being transferred. In determining whether it is "more likely than not" that an individual would be tortured, the United States takes into account the treatment the individual is likely to receive upon transfer, including, *inter alia,* the expressed commitments of officials from the foreign government accepting transfer. When evaluating the adequacy of any assurances, Department officials consider the identity, position, or other information concerning the official relaying the assurances, and political or legal developments in the foreign country concerned that would provide context for the assurances provided. Department officials may also consider U.S. diplomatic relations with the country concerned when evaluating assurances. For instance, Department officials may make a judgment regarding foreign government's incentives and capacities to fulfill its assurances to the United States, including the importance to the government concerned of maintaining good relations and cooperation with the United States. In an appropriate case, the Department of State may also

---

[1] The Human Rights Reports are the official State Department reports to Congress on human rights conditions in individual countries for a given year as mandated by law (sections 116(d) and 502(b) of the Foreign Assistance Act of 1961, as amended, and section 505(c) of the Trade Act of 1974, as amended).

6

consider seeking the foreign government's assurance of access by governmental or non-

governmental entities in the country concerned to monitor the condition of an individual returned

to that country, or of U.S. Government access to the individual for such purposes. In instances in

which the United States transfers an individual subject to assurances, it would pursue any credible

report and take appropriate action if it had reason to believe that those assurances would not be,

or had not been, honored. In an instance in which specific concerns about the treatment an

individual may receive cannot be resolved satisfactorily, we have in the past and would in the

future recommend against transfer, consistent with the United States policy.

9. The Department of State's ability to seek and obtain assurances from a foreign

government depends in part on the Department's ability to treat its dealings with the foreign

government with discretion. Consistent with the diplomatic sensitivities that surround the

Department's communications with foreign governments concerning allegations relating to

torture, the Department of State does not unilaterally make public the specific assurances or

other precautionary measures obtained in order to avoid the chilling effects of making such

discussions public and the possible damage to our ability to conduct foreign relations. Seeking

assurances may be seen as raising questions about the requesting State's institutions or

commitment to the rule of law, even in cases where the assurances are sought to highlight the

issue for the country concerned and satisfy the Department that the country is aware of the

concerns raised and is in a position to undertake a commitment of humane treatment of a

particular individual. There also may be circumstances where it may be important to protect

sources of information (such as sources within a foreign government) about a government's

7

willingness or capability to abide by assurances concerning humane treatment or relevant international obligations.

10. If the Department were required unilaterally to disclose outside appropriate Executive branch channels its communications with a foreign government relating to particular mistreatment or torture concerns, that government, as well as other governments, would likely be reluctant in the future to communicate frankly with the United States concerning such issues. I know from experience that the delicate diplomatic exchange that is often required in these contexts cannot occur effectively except in a confidential setting. Later review in a public forum of the Department's dealings with a particular foreign government regarding transfer matters would seriously undermine our ability to investigate allegations of mistreatment or torture that come to our attention and to reach acceptable accommodations with other governments to address those important concerns.

11. The Department's recommendation concerning transfer relies heavily on the facts and analyses provided by various offices within the Department, including its Embassies. Confidentiality is often essential to ensure that the advice and analysis provided by these offices are useful and informative for the decision-maker. If those offices are expected to provide candid and useful assessments, they normally need to know that their reports will not later be publicly disclosed or brought to the attention of officials and others in the foreign States with which they deal on a regular basis. Such disclosure could chill important sources of information and could interfere with the ability of our foreign relations personnel to interact effectively with foreign State officials.

8

12. Without addressing the specifics of any particular individual, a court decision to enjoin a detainee transfer, either altogether or until further order of the court, would undermine the United States' ability to reduce the numbers of individuals under U.S. control and our effectiveness in eliciting the cooperation of other governments to bring to justice individuals who are subject to their jurisdiction. Any judicial decision to review a transfer decision by the United States Government or the diplomatic dialogue with a foreign government concerning the terms of transfer could seriously undermine our foreign relations. Moreover, judicial review of Department of Defense determinations to transfer an individual detainee to a foreign government inevitably would encumber and add delays to what is already a lengthy process. Any judicial review and the resulting delays could undermine a foreign government's ability to prosecute and also harm United States' efforts to press other countries to act more expeditiously in bringing terrorists and their supporters to justice.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 8, 2005.

Pierre-Richard Prosper

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULAH HAKMAT, <u>et al.</u>,<br><br>    Petitioners,<br>  v.<br><br>GEORGE W. BUSH, <u>et al.</u>,<br><br>    Respondents. | Civil Action No. 06-1753 (EGS) |

## [Proposed] Order

It is hereby ordered that petitioner's Motion for Order Requiring Respondents to Provide Counsel for Petitioner and the Court with 30-Days' Advance Notice of Any Intended Removal of Petitioner from Guantanamo (dkt. no. 10) is DENIED.

IT IS SO ORDERED.

Dated:          _____

            EMMET G. SULLIVAN
            UNITED STATES DISTRICT JUDGE